UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

IVOCLAR VIVADENT, INC.,                                    04-CV-0262E(F)
                    Plaintiff,

         -vs-

NORTHEAST DENTAL & MEDICAL SUPPLIES, INC.
and NORHTEAST DENTAL SUPPLIES, INC.,
                    Defendants.

---                                                        MEMORANDUM

NORTHEAST DENTAL AND MEDICAL SUPPLIES, INC.,
                    Counterclaimant,                                and

         -vs-                                              ORDER[1]

IVOCLAR VIVADENT, INC,
                    Counterdefendant,
         and
IVOCLAR VIVADENT, A.G. and
PETERSON DENTAL SUPPLY, INC.,
                    Additional Counterdefendants.

---

## INTRODUCTION AND BACKGROUND

Plaintiff Ivoclar Vivadent, Inc. ("Ivoclar") commenced this action and three

others [2] on April 5, 2004 against defendants Northeast Dental & Medical Supplies,

Inc. and Northeast Dental Supplies, Inc. (collectively, "Northeast"), and the other

defendants in these different actions, alleging, *inter alia,* trademark infringement

---

[1] This decision may be cited in whole or in any part.

[2] Case numbers 04-CV-0261E(F), 04-CV-0263E(F) and 04-CV-0264E(F).  All cases have similar motions pending that will be resolved in similar but separate Orders.

and dilution (15 U.S.C. §§1114 & 1125), unlawful importation (15 U.S.C. §1124 and 19 U.S.C. §1526), misappropriation and unfair competition with regard to certain of its registered and unregistered trademarked dental products.   An Amended Complaint was filed July 27, 2004 (Dkt. #8) and on December 13, 2004 Northeast filed its answer[3] with counterclaims (Dkt. #12).   On March 8, 2005 Ivoclar filed its reply to the counterclaims (Dkt. #17) and on September 22, 2005, also filed a motion pursuant to FRCvP 12(c) to dismiss those counterclaims (Dkt. #21), which is currently pending before the Court.   Also pending are Northeast's motions for a protective order (Dkt. #26) and to compel (Dkt. #30) and Ivoclar's motions to compel (Dkt. #34) and for a stay (Dkt. #35).

The Amended Complaint alleges the following.   Ivoclar is in the business of marketing, distributing and selling dental products nationally and internationally.   Northeast is a New York corporation that also sells and distributes, among other things, dental products. Ivoclar has valid and inherently distinctive trademarks with regard to certain enumerated dental products and claims a carefully cultivated reputation for excellent product quality, customer service and reliability.   Northeast unlawfully gained possession of some of Ivoclar's products (those enumerated in the complaint) and imported them into the United States.   Northeast then sold them without Ivoclar's permission or

---

[3] After a motion for a more definite statement was resolved.

consent.  Further, Northeast distributed the products without the high quality advertising and marketing that Ivoclar demands, with insufficient inspection, quality control, labeling, packaging[4] or warranties, hence making them materially different from the products as sold and distributed by Ivoclar and its authorized distributors.  As such, Ivoclar's customers were likely to be misled, confused or deceived as to the source of the products and the distinctive quality of Ivoclar's trademarks and the integrity of its business reputation were threatened.  Ivoclar further alleges that Northeast refused to stop selling its products or identify their source of supply when so requested by Ivoclar and continues to engage in the alleged unlawful practices.  The complaint seeks, *inter alia,* a permanent injunction, an accounting, constructive trust, treble damages, attorney's fees and costs.

Northeast's counterclaims seek (1) a judicial declaration under the Declaratory Judgment Act, 28 U.S.C. §2201 *et seq.* ("the DJA") that Northeast is not liable to Ivoclar under any of the claims asserted in the complaint and that Ivoclar and the additional named defendants, Ivoclar Vivadent, A.G.(Ivoclar's foreign parent corporation — hereinafter "IvoclarAG") and Peterson Dental Supply (an authorized Ivoclar distributor —  hereinafter "Peterson")[5] are liable to

---

[4] *I.e.,* the failure to enclose the requisite safety information such as the Material Safety Data Sheets as required by the Occupational Safety and Health Administration.

[5] When referred to collectively, these parties shall be referred to as "the counterclaim defendants".

Northeast for the remaining counterclaims contained therein["Count I"]; (2) judgment against the counterclaim defendants, for violations of Section 1 of the Sherman Act (15 U.S.C. §1), the Wilson Tariff Act (15 U.S.C. §8) and the New York Donnelly Act (Article 22, section 340 of the New York General Business Law) ["Counts II, III and IV", respectively]; (3) judgment against the counterclaim defendants for tortious interference with prospective and advantageous business relations and civil conspiracy ["Counts V and VI", respectively]; and (4) cancellation of Ivoclar's trademark registrations pursuant to Section 37 of the Lanham Act (15 U.S.C. §1119) ["Count VII"].  The counterclaim defendants have replied to the counterclaims and now move this Court for their dismissal for failure to state a claim upon which relief can be granted.

## DISCUSSION

At the outset, the Court finds that because Count I of the counterclaims seeks declaratory relief for exactly the same claims enumerated in both the underlying suit and the remaining counterclaims, it is duplicative and redundant and shall be dismissed.  *See generally, Wilton* v. *Seven Falls Co.*, 515 U.S. 277, 282 (1995) ("[D]istrict courts possess discretion in determining whether and when to entertain an action under the [DJA] ***").  Hence, only Counts II through VII of the counterclaims remain.

The counterclaim defendants have sought a judgment on the pleadings. Judgment on the pleadings pursuant to FRCvP 12(c) is appropriate "where

material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers* v. *M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir. 1988). The standard for granting a Rule 12(c) motion is the same as that of a Rule 12(b)(6) motion for failure to state a claim, in that the district court must accept the allegations in the complaint (or counterclaim, as the case may be) as true and draw all inferences in the non-moving party's favor. *Patel* v. *Contemporary Classics of Beverly Hills,* 259 F.3d 123, 126 (2d Cir. 2001)(*citing Irish Lesbian & Gay Org.* v. *Giuliani,* 143 F.3d 638, 644 (2d Cir.1998), *Sheppard* v. *Beerman,* 18 F.3d 147, 150 (2d Cir.1994), and *Ad-Hoc Comm. of Baruch Black & Hispanic Alumni Ass'n* v. *Bernard M. Baruch Coll.,* 835 F.2d 980, 982 (2d Cir.1987)). In other words, the Court is required to read a complaint generously, accepting the material facts alleged therein as true and drawing all reasonable inferences from the complainant's allegations. *California Motor Transp. Co.* v. *Trucking Unlimited,* 404 U.S. 508, 515 (1972); *Frasier* v. *Gen. Elec. Co.,* 930 F.2d 1004, 1007 (2d Cir. 1991).

The material facts[6] which the Court accepts as true and which form the underpinning of the remaining Counts of Northeast's counterclaims are as follows. Northeast sells genuine Ivoclar Vivadent products at lower prices than the same

---

[6] The 111 paragraphs of Northeast's counterclaims contain some factual allegations and many statements which are neither material nor factual and consist mainly of argument and conclusion. While the Court will give all reasonable inferences to the alleged facts, only these *facts* will be considered as true and not the arguments or conclusions.

products sold by Ivoclar and its authorized distributors, including Peterson. Northeast gets these products from its supplier, North American Dental Wholesalers, Inc., a Toronto based importer and distributor of dental supply products ("N. American")[7].  The products N. American sells to Northeast are manufactured by IvoclarAG outside of the United States.  N. American obtains them outside of the United States from either IvoclarAG directly or from one of IvoclarAG's authorized distributors, then imports them into the States.  The cost of the products when purchased in this manner is substantially lower than their cost when purchased inside of the States from Ivoclar.  Northeast is therefore able to offer and sell them to its customers at competitive prices.  The Ivoclar Vivadent products Northeast sells are the same as the products Ivoclar and Peterson sell in that they are all manufactured by IvoclarAG.  Northeast admits that, prior to the filing of the instant suit, the products were distributed without including the Material Safety Data Sheets or any warranty.  Since then, they have been including these Data Sheets and a disclaimer of association with Ivolcar.  It has also been offering its own warranty on the products.  The only difference remaining in the products are minor differences in the labeling and packaging. In or about September 2002, Northeast began marketing the Ivoclar Vivadent trademarked products enumerated in the complaint to approximately 20,000 dentists in the northeast United States at discounted prices.  In October 2002,

---

[7] And defendant in companion case 04-CV-0263E(F).

Peterson placed an order with Northeast, purchased some of the products and then sent them to Ivoclar.  When Ivoclar determined that the products had not been purchased from either Ivoclar or Peterson, it informed Northeast that it did not have permission to sell the trademarked products, demanded that Northeast immediately stop its sale and disclose their supplier information.  Ivoclar did not indicate to Northeast that the products it was selling were not genuine or commercially fit for distribution in the United States, or that they were materially different from the products sold here through Ivoclar.  Ivoclar stated that if Northeast did not stop selling the unauthorized product, legal action would be taken. When Northeast did not comply, Ivoclar filed the instant suit [8].  Less than one month later, on May 12, 2004, Northeast informed Ivoclar that it considered the suit to be baseless and requested that it be discontinued.  At the same time, Northeast offered to provide disclaimer information to all who purchased the Ivoclar Vivadent products from it indicating that it had no affiliation with Ivoclar and was not authorized to sell its product.  It also stated that it would include the Material Safety Data Sheets when shipping the items to the consumers.  Ivoclar responded that the disclaimer was insufficient and nevertheless declined to withdraw the suit but again asked for information regarding Northeast's supplier.

The portion of the Sherman Act, alleged to have been violated in counterclaim Count II, states that "[e]very contract, combination in the form of

---

[8] Along with the three other companion suits referred to herein, *supra*.

trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. §1.

The portion of the Wilson Tariff Act, alleged to have been violated in counterclaim Count III, states that

> "every combination, conspiracy, trust, agreement, or contract is declared to be contrary to public policy, illegal, and void when the same is made by or between two or more persons or corporations, either of whom, as agent or principal, is engaged in importing any article from any foreign country into the United States, and when such combination, conspiracy, trust, agreement, or contract is intended to operate in restraint of lawful trade, or free competition in lawful trade or commerce, or to increase the market price in any part of the United States of any article or articles imported or intended to be imported into the United States, or of any manufacture into which such imported article enters or is intended to enter."

15 U.S.C. §8.

Section 340 of New York's General Business Law, alleged to have been violated in counterclaim Count IV, similarly declares that

> "1.  Every   contract,   agreement,   arrangement   or combination whereby
>   "A monopoly in the conduct of any business, trade or commerce or in the furnishing of any service in this state, is or may be established or maintained, or whereby
>   "Competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained or whereby
>   "For the purpose of establishing or maintaining any such monopoly or unlawfully interfering with the free exercise of any activity in the conduct of any business,

> trade or commerce or in the furnishing of any service in
> this state any business, trade or commerce or the
> furnishing of any service is or may be restrained, is
> hereby declared to be against public policy, illegal and
> void."

N.Y. Gen. Bus. Law §340(1).

All of the counterclaims employ the same factual allegations and legal principles and will be referred to by the Court collectively as the antitrust claims.[9] Moreover, because the claim to cancel the Ivoclar trademarks (Count VII) depends upon the sufficiency of the antitrust claims, it will also be referred to and decided in conjunction with the antitrust claims. The antitrust claims allege violation of the respective laws by way of a restraint of lawful trade and the elimination of price competition

> "a. through vertical price restraints for the purpose of
> fixing and maintaining wholesale and/or retail prices of
> Ivoclar Vivadent trademark products at Ivoclar USA's
> [Ivoclar] suggested retail price levels that are
> substantially above the price levels at which these
> products would be distributed and sold but for
> counterclaim defendants' unlawful anti-competitive
> conduct; and
> b. the bad faith enforcement of Ivoclar Liechtenstein's
> [IvoclarAG] and Ivoclar USA's trademarks through

___

[9] The antitrust provisions of the Wilson Tariff Act follow the same pattern as the Sherman Act and when a party has filed to make out a claim under section 1 of the Sherman Act, any attendant Wilson Tariff Act claim will also necessarily fail. *United States* v. *Cooper,* 312 U.S. 600, 608 (1941); *Hunt* v. *Mobil Oil Corp.,* 550 F2d 68, 75 n. 8 (2d Cir. 1977); *Leider* v. *Ralfe*, 2003 WL 24571746, *2 fn 3 (S.D.N.Y. 2003). Further, "New York's Donnelly Act, N.Y.Gen.Bus.L. § 340 is modeled on the Sherman Act, 15 U.S.C. § 1, and generally is construed in accordance with federal precedents. *Solla* v. *Aetna Health Plans of New York Inc.,* 14 F.Supp.2d 252, 259 - 60 (E.D.N.Y. 1998), *citing Re-Alco Industries, Inc.* v. *National Center for Health Education, Inc.,* 812 F.Supp. 387, 393 (S.D.N.Y.1993) and *Anheuser-Busch, Inc.* v. *Abrams*, 71 N.Y.2d 327, 335 (1988).

"sham" litigation having the overall scheme to unlawfully extend the scope of their trademark rights."

(Dkt. #12 - Answer and Counterclaims at ¶¶92 & 97[10]).

The claims allege no facts that the counterclaim defendants directly attempted to control the price of these products in their interactions with Northeast or even between the counterclaim defendants themselves.   For example, there are no facts alleged that any of the counterclaim defendants ever instructed Northeast (or any of its authorized distributors) to sell the products at a certain price, or that a price directive was ever discussed with anyone.[11]  There are no substantive factual allegations against IvoclarAG, only conclusion and argument regarding collusion and conspiracy.   Similarly, other than conclusory conspiracy arguments, the only substantive factual allegation against Peterson is that it was an authorized distributor of the trademarked products and that it purchased product from Northeast and forwarded it to Ivoclar.   There are no allegations that the products at issue, consisting of certain Ivoclar Vivadent trademarked products, were in any way unique to the market of dental supplies.

---

[10] Count IV, the claim relative to New York's General Business Law, realleges and incorporates all prior allegations and additionally states that "[c]ounterclaim defendants' conduct unlawfully restrains competition and/or the free exercise of Northeast's business, trade and commerce." (Dkt. #12, ¶101).

[11] Although many conclusory allegations to this effect are made, there are no factual allegations in support thereof.

From the facts as enumerated above and in a light most favorable to Northeast, the Court can only infer that Ivoclar, with minimal assistance from Peterson, attempted to control the distribution of its products (and tacitly, the price thereof) by requiring that they be sold only by authorized distributors under strict marketing, quality control and packaging parameters and sued those who attempted to sell the products but were not authorized to do so.

In their motion to dismiss the counterclaims, counterclaim defendants argue as follows that the antitrust claims fail as a matter of law.  The allegations amount to nothing more than an exclusive distributorship and Ivoclar's attempt to preserve it, which is presumptively lawful.  In order to negate this presumption, Northeast must allege that Ivoclar's attempt to exclude them from distributing the trademarked products satisfies the Rule of Reason analysis.  Under the Rule of Reason, Northeast must plead — and prove — an anticompetitive effect in a relevant market.  A relevant market is comprised of a geographic market which Northeast has pled (*i.e.*, the United States)[12] and a product market, which Northeast has not pled.  Therefore, Northeast's pleadings fail with respect to alleging facts in support of the essential finding of a product market.  More particularly, because the product market is limited to certain Ivoclar Vivadent

---

[12] "The 'geographic market' is simply the geographic area where the competition occurs." *E&L Consulting, Ltd.* v. *Doman Industries Ltd.,* 360 F.Supp.2d 465, 471 (E.D.N.Y. 2005), *quoting, Beyer Farms, Inc.* v. *Elmhurst Dairy, Inc.,* 142 F.Supp.2d 296, 303 (E.D.N.Y.2001), *aff'd,* 35 Fed.Appx. 29 (2d Cir.2002) (other citations omitted).

trademarked products (*i.e.*, a single brand),  it thus does not constitute a legally cognizable product market without further evidence of uniqueness to the market of these products to the extent that they can be considered a market unto themselves, facts which the counterclaims clearly do not allege.   Lastly, counterclaim defendants argue that "the fatal consequences of Northeast's failure to allege a product market become crystal clear when one attempts to answer the second, fundamental antitrust inquiry: Do the counterclaim defendants have market power?". (Dkt. #21-2, p. 15).  Northeast failed to allege that counterclaim defendants possessed market power, and without such there is no antitrust violation because consumers are able to switch to a competitor's product in the event of a manufacturer's implementation of an anticompetitive restraint.

The Court rejects Northeast's argument that counterclaim defendants' conduct should be viewed as horizontal in nature (or that Northeast has properly pled such), subjecting it to a *per se* illegal analysis.  *See, Business Electronics Corp.* v. *Sharp Electronics Corp.,* 485 U.S. 717, 724 - 30 (1988)[13]; *Oreck Corp.* v. *Whirlpool Corp.,* 579 F.2d 126, 131 (2d Cir. 1978) [14].  Rather, the Court agrees with

---

[13] Rejecting a *per se* rule and applying the Rule of Reason analysis.  A restraint is not horizontal because it has horizontal effects but rather because it is the product of a horizontal agreement, *i.e.*, a restraint imposed by agreement between competitors. *Business Electronics*, at 730.  The horizontal effect approach "is of course a conceivable way of talking, but if it were the language of antitrust analysis there would be no such thing as an unlawful vertical restraint, since all anticompetitive effects are by definition horizontal effects." *Id.* at fn 4.

[14] "It is important to distinguish between 'horizontal' restraints, i. e. agreements between competitors at the same level of market structure, and 'vertical' restraints, i. e. combinations of
(continued...)

counterclaim defendants' arguments and finds that the counterclaims are defective and must be dismissed, primarily because they fail to allege or define the product market.

First, it must be noted that exclusive distributorship arrangements are presumptively legal. *Electronics Commc'ns. Corp.* v. *Toshiba America Consumer Prod., Inc.,* 129 F.3d 240, 245 (2d Cir. 1997).   To overcome this presumption of legality, it must be alleged that the exclusive dealership causes harm to competition because it prevents competitors from getting their products to consumers altogether. *United States* v. *Visa U.S.A., Inc.,* 344 F.3d 229, 242 (2d Cir. 2003).   This is not a question in a vacuum, involving only the parties and the products at issue in this suit.   "[T]he proper inquiry is whether there has been an 'actual adverse effect on competition as a whole in the relevant market.'" *Ibid.,* quoting *K.M.B. Warehouse Distrib., Inc.* v. *Walker Mfg. Co.,* 61 F.3d 123 (2d Cir. 1995).   As stated *supra,* the relevant market looks at the overall product market within a geographical area.

> "With respect to product market, '[i]f a complaint fails to allege facts regarding substitute products, to

---

[14](...continued)

persons at different levels of the market structure, such as manufacturers and distributors. Horizontal restraints alone have been characterized as 'naked restraints of trade with no purpose except stifling competition' and, therefore, *per se* violations of the Sherman Act.  On the other hand, while vertical restrictions may reduce intrabrand competition by limiting the number of sellers of a particular product, competing for a given group of buyers, they also promote interbrand competition by allowing a manufacturer to achieve certain efficiencies in the distribution of its products.  They are, therefore, to be examined under the Rule of Reason standard."(internal citations omitted)

> distinguish among apparently comparable products, or
> to allege other pertinent facts relating to cross-elasticity
> of demand[15] *** a court may grant a Rule 12(b)(6)
> motion.'"

*E&L Consulting, Ltd.* v. *Doman Indus. Ltd.*, 360 F.Supp.2d 465, 472 (E.D.N.Y. 2005)(internal citation omitted).  The Court construes this to provide for dismissal under FRCvP 12(c) as well.  *See, Patel, supra; Irish Lesbian & Gay Org., supra; Sheppard, supra; Ad-Hoc Comm. of Baruch Black & Hispanic Alumni Ass'n, supra.*

The products at issue herein are clearly of a single brand, *i.e.*, various enumerated Ivoclar Vivadent trademarked dental apparatus.  The counterclaims do not allege that the products are in any way unique to the market of dental supplies, that there is an absence of comparable or substantive products, or that they are essential for Northeast (who admittedly sells a wide variety of dental and other medical products) to compete in the industry.  The antitrust claims fail to plead facts even suggesting "some type of harm to competition market-wide" (*E&L Consulting, Ltd., supra* at 475) and Counts II, III, IV and VII of Northeast's counterclaims will therefore be dismissed.  Northeast will be granted leave to amend.

With respect to the counterclaim alleging tortious interference with business relations (Count V), such fails to plead the essential facts in support of

---

[15] Cross-elasticity of demand relates to market power.  "Retail market power is rare, because of the usual presence of interbrand competition and other dealers (*see Continental T.V., Inc.* v. *GTE Sylvania Inc.*, 433 U.S. 36, 54, 97 S.Ct. 2549, 2559-60, 53 L.Ed.2d 568 (1977)) and it should therefore not be assumed but rather must be proved." *Business Electronics Corp., supra,* at 727, fn 2.

such a claim and will be dismissed.  A claim of this nature is very difficult to sustain and must therefore meet very demanding pleading and proof requirements. *See, G.K.A. Beverage Corp.* v. *Honickman,* 55 F.3d 762, 768 (2d Cir. 1995)(outlining four distinct elements which must be alleged in order to sustain such a claim); *Kramer* v. *Pollock-Krasner Found.,* 890 F. Supp. 250, 258 (S.D.N.Y. 1995)(demanding requirements).  The Court will not address these requirements in detail, but has considered them and hereby finds that Northeast has failed to satisfy any of them and its claim will therefore be dismissed.  Northeast will be granted leave to amend.

With respect to the counterclaim alleging civil conspiracy (Count VI), the Court finds that it contains only bare bones allegations of conspiracy without any supporting facts and will also be dismissed. *See, Heart Disease Research Found.* v. *General Motors*, 463 F.2d 98, 100 (2d Cir. 1972); *Floors-N-More, Inc.* v. *Freight Liquidators*, 142 F. Supp.2d 496, 501 (S.D.N.Y. 2001).  Northeast will be granted leave to amend.

With respect to the pending discovery motions, the Decision and Order herein renders the motion to stay (Dkt. #35) moot and it is therefore denied.  The remaining motions (Dkt. #26, #30 and #34) *may* be rendered moot because the Decision and Order herein substantially changes the nature of the claims between the parties and the discovery needs, therefore, may also be substantially changed. In the interest of judicial economy, these motions will be denied without prejudice

and the Court will permit that they may be re-filed *no sooner than* sixty days after the entry of the Decision and Order herein, subject to Northeast's filing of amended counterclaims (if, in fact it chooses to so file) and the parties' re-evaluation of their respective discovery needs.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the counterclaim defendants' motion (Dkt. #21) to dismiss Northeast's counterclaims is hereby **GRANTED,** that the motion to stay (Dkt. #35) is **DENIED** as moot and that the motions to compel and for a protective order (Dkt. ##26, 30 and 34) are **DENIED** without prejudice.  Northeast shall have thirty days from the entry of this Order to amend the counterclaims.  An amended scheduling order shall follow.

DATED:      Buffalo, N.Y.

            August 30, 2006


                              _____
                              */s/ John T. Elfvin*
                              JOHN T. ELFVIN
                              S.U.S.D.J.